Filed 6/18/21  P. v. Pena CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS PENA,<br><br>    Defendant and Appellant. | B303543<br><br>(Los Angeles County<br>Super. Ct. No. BA425994) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed.

Robert A. Werth, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Carlos Pena of home invasion robbery, burglary, and assault by means likely to produce great bodily injury. He appeals, arguing that the evidence was insufficient to support the verdicts and the trial court committed instructional and sentencing errors. Discerning no prejudicial error or evidentiary insufficiency, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *Facts*

   a. *Background*

Hugo O. owned a duplex located on Sheridan Street in Los Angeles, where he lived with his girlfriend, Maricarmen G.; her eight-year-old son sometimes stayed there as well. The duplex was divided into two apartments, one upstairs and one downstairs. Hugo and Maricarmen lived in the upper apartment, and used the living room as their bedroom.[2] Hugo rented three bedrooms in the upper apartment to other persons, including Marcos L., one of Hugo's "helpers" in his construction business. Another helper stayed in the downstairs apartment. The upper

---

[1]    We derive the facts primarily from testimony offered by the victim, Hugo O.; his girlfriend, Maricarmen G.; one of Pena's accomplices; and various law enforcement personnel. Apart from the testimony of a gang expert offered by codefendant Everardo Estrada, the defense presented no evidence. We view the evidence in accordance with the usual rules governing appellate review. (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1303–1304.)

[2]    For ease of reference, we hereinafter refer to this room as the living room.

2

apartment had a front door that led into the living room, and a back door off the kitchen.  The property was surrounded by a chain link fence, and was equipped with a security camera that showed the front yard and entrance.  Hugo worked as a contractor in the construction industry, and was not a gang member.

Pena, Everardo Estrada, Carlos Flores, and Jorge Nieto were all members of the State Street criminal street gang.  Estrada, who went by the moniker "Lalo," and Flores, who went by the moniker "Solo," were in their 40's.  They were "respected," older members of the gang.  Pena, who was 19 at the time of the crimes, went by the moniker "Trigger" or "Little Trigger."  Nieto, who was known as "Sporty," was 17.  Nieto and Pena had known each other for years.

State Street gang members would often jump Hugo's fence and cross his property.  Over time, their behavior escalated, and they would break into the lower apartment and hang out there.  When Hugo asked them to stop, they laughed, said it was their neighborhood, and he could not tell them what to do.  When Hugo told Estrada he would call the police, Estrada replied, "Well, go ahead and you see what's going to happen to you motherfucker."  Afraid, Hugo did not follow through on his threat.  On one occasion the gang members broke a couple of windows; on another, they kicked the door of the upper apartment, damaging it.  Hugo boarded up the lower level in an attempt to stop them entering, but they pulled the boards off.

Nieto, however, was friendly towards Hugo.  Nieto told Hugo he did not think it was right for the other gang members to invade his property, and said he was on Hugo's side.  Hugo allowed Nieto into the upstairs apartment and socialized with

him sometimes. Pena was also cordial to Hugo. At some point, Hugo offered both Pena and Nieto jobs. He also asked them to keep the other gang members from invading the lower apartment.

b. *The burglary, robbery, and assault*

Hugo did not own an assault rifle. However, approximately a month before the charged crimes, "Mike," a friend of one of Hugo's tenants, brought an assault rifle to the duplex and showed it to Hugo. Hugo held the rifle, and then gave it back to Mike. Nieto was present at the time; he held the rifle as well. Hugo saw the rifle at the duplex the next day.

Approximately two weeks later, in mid-May 2014, Estrada and two other gang members came to the duplex and demanded that Hugo give Estrada two guns and $400 within two weeks. Hugo stated he did not think that would be possible. Estrada said he was not playing, and Hugo "better have that ready for me in two weeks or you'll take the consequences motherfucker."

At approximately 2:00 a.m. on June 8, 2014, Hugo was in his tenant Marcos's room, talking to Marcos and Marcos's two friends, who were visiting. Maricarmen was in the living room, awake; her son was asleep. Via the security camera, she saw five men running toward the front door. Pena was among them. As he approached, Maricarmen heard Pena say, "Who cares, fool, we'll just blast him." The men banged on the door, repeatedly screaming "open the door" and threatening to break it down. She ran to get Hugo. When she and Hugo returned to the front door, they found a gang member already inside, trying to open it for the others. However, the door had three locks and the intruder could not reach the highest one. The intruder told Hugo, "there's someone here to see you." Hugo told him no one was coming into

4

his house, and ordered him to get out.  As Hugo pushed the intruder toward the back door, Hugo told Maricarmen to stay in the living room and if something didn't seem right, to call the police.

Thereafter, a man came into the living room, demanded Maricarmen's cell phone, and told her to stay there with the door closed.  Maricarmen could hear men in the duplex, demanding that everyone give them their wallets and cell phones, and telling them to "shut the fuck up."  She recognized Estrada's voice, and heard him punching someone.  At some point a gang member placed Victoria, a visitor who was also present in the duplex, in the room with Maricarmen.  Victoria advised Maricarmen to take her son and leave.  Maricarmen did so, despite her fears for Hugo.  She ran with her son to a fast food restaurant, where she called 911.  A tape of her frantic 911 call was played for the jury.

Meanwhile, just after he told Maricarmen to stay in the living room and as he was escorting the intruder out the back, Hugo encountered Pena and Nieto coming inside through the back door.  They forced him into Marcos's room.  Pena said quietly to Hugo, "Hey, they're going to ask you if you have guns here[,] just tell them you don't have any and you're going to be okay."

Flores entered the room and said he was Solo from State Street, he was there to get something that belonged to one of his friends, and someone else needed to talk to Hugo as well.  Estrada entered the room and ordered Nieto and Pena to take wallets and phones from Hugo, Marcos, and Marcos's friends.  Pena took Hugo's phone and wallet.  Nieto took wallets and phones from Marcos and the two visitors.  Hugo complied with

5

the demand to relinquish his wallet and phone because he was afraid and was outnumbered.

After obtaining the phones and wallets, Nieto and Pena stood back. Estrada said, "So where is my stuff that I asked you to get motherfucker." Hugo replied that he didn't know what Estrada was talking about. Estrada replied, "where my guns and my money motherfucker." Estrada then punched Hugo in the face, breaking his nose and knocking him to the ground. Hugo did not fight back. Estrada kicked Hugo's head and body and then forced him to stand up. Estrada said: "I'm going to ask you one more time motherfucker, I'm not fucking playing where is my guns and my money." When Hugo said he had nothing for Estrada, Estrada resumed the attack, punching Hugo's face and body. Estrada then said to Flores, "Come on, you can fuck him up." When Marcos attempted to come to Hugo's aid, the assailants forced him to face the wall on his knees.

Flores and Estrada engaged in a prolonged attack on Hugo. They took turns kicking, stomping and punching him. They stood on his stomach and knees and jumped with full force, and pushed his head into the floor. Estrada burned Hugo's hand with a lit cigarette. Pena did not participate in the attack, and Hugo did not see Pena after he took Hugo's phone. During the assault, Hugo did not fight back, but simply tried to cover himself.

Eventually, Estrada complained that his hand was hurting from hitting Hugo, and demanded that someone retrieve a knife from the kitchen so he could "finish this motherfucker." No one responded. Estrada repeated his command, but then noticed one of Hugo's construction tools, a cordless drill with a three-inch screwdriver bit. Estrada grabbed the drill and threatened to put out Hugo's eyes with it. He attempted to do so, but Hugo used all

his remaining strength to push the drill away. Estrada then used the drill on Hugo's stomach, inflicting two wounds through his clothing. At some point during the attack, Estrada pulled cash from Hugo's wallet and said, "Look, boys, more money for the hood."

Estrada then told Nieto, "You fuck him up now," and Nieto moved to comply; however, Estrada changed his mind and stopped him. Estrada then asked Hugo where Maricarmen was. Hugo said she was in the living room where her son was sleeping, and pleaded with him to "leave her out of this" and not hurt her or her child. Estrada replied that he did not "give a fuck" about them. Estrada told Nieto to grab Hugo, and the group headed for the living room. As they walked down the hall, Estrada came up behind Hugo and hit the back of his head with the drill, causing a large gash and excruciating pain. Hugo almost lost consciousness, but Nieto pulled him to his feet.

Upon discovering that Maricarmen was no longer in the living room, Estrada called Hugo a liar and said, "let's take this motherfucker for a ride." He told Nieto and Flores to take any of Hugo's tools that they wanted. Hugo observed them yank the surveillance camera equipment and monitor from the wall. The group forced Hugo down the stairs to the back of the house. Hugo quietly asked Nieto to let him go, but Nieto said, "Fuck no" and "shut the fuck up."

Once outside, Hugo saw two men standing next to a car, with the trunk open. In the trunk sat a large, long knife. Fearing that he was about to be killed, Hugo unsuccessfully attempted to grab the knife. The men circled around him. Estrada's phone rang, and he stepped away from the others to answer it. With the assailants momentarily distracted, Hugo

broke free and ran for his life. Flores chased after him. Hugo ran past his dog, a pit bull, who was chained outside the duplex. The dog apparently stopped Flores's pursuit, giving Hugo time to escape. Flores yelled after him, "You're dead anyways motherfucker," and mimicked firing a gun at him.

Hugo knocked on the door of a nearby residence, but no one answered. He then fled down a dark alley, found an unlocked residence where no one was home, and hid inside for hours. During the night, he could hear men's voices and believed the gang was looking for him. At daylight, he walked to a nearby police station and reported what had transpired. He was transported to a hospital by ambulance, where he remained for two days.

### c. *Nieto's testimony*[3]

Nieto testified that he hung out with Hugo sometimes and occasionally used methamphetamine with him.

At approximately 1:00 a.m. on June 8, 2014, he and Pena were drinking beer at Pena's house. Pena's neighbor asked if they knew someone who sold methamphetamine because he wished to purchase some. They called a neighborhood contact, "Raylene," for that purpose. Pena did not wish to go, because his girlfriend was imminently due to give birth, but Nieto talked him into going. Pena, Nieto, and the neighbor walked down the street to meet Raylene. En route, they ran into Flores, Estrada, and

---

[3] Nieto initially pled guilty to torture, with a gang enhancement. He testified pursuant to an agreement that if a judge determined he testified truthfully, he would be allowed to withdraw his plea and instead plead guilty to robbery in concert and assault with a deadly weapon, with a negotiated sentence of 10 years.

8

another gang member known as "Scrappy." The older gang members stopped them, told the neighbor to leave, and asked whether Nieto had a gun. When Nieto said no, Flores asked why he was "running around" without one.[4]

Flores then brought up an incident that had occurred a few days earlier, in which Nieto had "made a mistake." He had been in a car with Pena and another gang member. When police pulled the car over, Nieto panicked and fled, leaving a gun in the car and causing the driver's arrest.[5] As punishment for this error, Flores "disciplined" Nieto by beating him with his fists for 10 to 15 seconds. Pena observed the beating.

Estrada then stated that "Hugo still has my rifle" and accused Hugo of being a "snitch" and working with the police. Flores asked if Nieto was a snitch as well, since he hung around Hugo's residence. Nieto denied it. Estrada replied, "Let's go get the rifle then." Nieto believed this to be a challenge. Nieto understood the rifle in question was the one he had previously seen at the duplex.

According to Nieto, when he knocked on the door at the duplex, Maricarmen asked who it was. After Nieto identified himself, Hugo opened the door. Estrada, Flores, and Scrappy then barged in. Pena came in after them. Once inside, at

---

[4]     Nieto explained that, as a State Street gang member, he was expected to carry a gun when walking around the streets.

[5]     A police officer also testified regarding this incident. In the early morning hours of June 5, 2014, he and a partner conducted a traffic stop of a vehicle that ran a stop sign. Nieto and Pena fled from the front and rear passenger seats, and a gun was found in the car.

Estrada's directive, Nieto took cell phones and money from the occupants.[6] When Hugo said he did not have the gun, Estrada, Flores, and Scrappy beat Hugo up, including punching, stomping, and kicking him. Pena did not participate. Estrada then pulled out the drill and aimed for Hugo's eye. At that point Pena said, "I got to bounce, I ain't trying to catch a case with my kid on the way," and left.

Nieto described the continuing attack on Hugo generally consistently with Hugo's account. After Hugo escaped, the assailants went their separate ways. Nieto threw the phones and wallets he had taken in a trash can.

d. *Aftermath*

After receiving Maricarmen's 911 call, officers responded to the duplex at approximately 2:50 a.m. They observed three to five people running from the duplex in different directions. They caught and detained Flores, who was holding a drill and was in possession of three cell phones. No gun was found in the duplex. The security camera was missing.

Hugo identified Flores, Estrada, Nieto, and Pena as the assailants. Maricarmen identified Estrada and Pena.

Hugo was relocated and never returned to his duplex, except to pick up his belongings while escorted by police officers. In addition to the security camera, his tools and equipment were gone, and the house had been ransacked. At the time of trial, Hugo still suffered severe physical pain and blackouts due to the attack.

---

[6] In a pretrial statement, Nieto stated that both he and Pena took the cell phones and wallets; at trial, however, he testified that Pena simply stood in the hallway and did not take anything from the victims.

10

e. *Gang testimony*

The People presented evidence to prove the gang enhancements, including information regarding the State Street gang's origins, primary activities, territory, membership, hierarchy, rivals, symbols, and predicate crimes.[7]

2. *Procedure*

Pena, Estrada, and Flores were tried together by a jury. Pena was found guilty of first degree residential burglary (Pen. Code, § 459);[8] assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); and home invasion robbery (§ 211). The jury found true a section 186.22, subdivision (b) gang enhancement as to all the offenses. It further found that in commission of the home invasion robbery, Pena voluntarily acted in concert and entered a structure described in section 213. The jury acquitted Pena of torture, kidnapping, attempted kidnapping, and assault with a deadly weapon.

The trial court denied Pena's motion for a new trial, and sentenced him to 23 years to life in prison. It ordered all fees and fines stayed.

Pena appeals.[9]

---

[7] Because Pena does not challenge the sufficiency of the evidence to prove the gang enhancements, we do not further detail it here. We discuss the gang testimony where relevant, *post*.

[8] All further undesignated statutory references are to the Penal Code.

[9] Pena filed an untimely notice of appeal. This court granted his application for relief from default.

11

## DISCUSSION

1. *Sufficiency of the evidence*

Pena contends that the evidence was insufficient to prove all three of his convictions. We disagree.

   a. *Standard of review*

" 'The test for evaluating a sufficiency of evidence claim is deferential: "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1102–1103.) We review the record in the light most favorable to the judgment, and presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Id.* at p. 1103; *People v. Vargas* (2020) 9 Cal.5th 793, 820.) The record must contain evidence that is " 'reasonable, credible, and of solid value.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) However, " ' "[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" ' " (*Ibid.*) The same standard applies to cases in which the prosecution relies primarily on circumstantial evidence (*People v. Vargas*, at p. 820); we must " ' "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.]" (*People v. Baker*, at p. 1103; *People v. Flores* (2020) 9 Cal.5th 371, 411.)

   b. *The evidence was sufficient to prove burglary*

Burglary has two elements: (1) unlawful entry into a structure, (2) with the intent to commit a theft or any other felony therein. (§ 459; *People v. Anderson* (2009) 47 Cal.4th 92, 101; *People v. Montoya* (1994) 7 Cal.4th 1027, 1041; *People v.*

*Garcia* (2017) 17 Cal.App.5th 211, 223.) The defendant's intent to commit the crime must exist at the time he enters the building. (*People v. Hughes* (2002) 27 Cal.4th 287, 348; *People v. Holt* (1997) 15 Cal.4th 619, 669; *In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.) However, "[o]ne may be liable for burglary upon entry with the requisite intent, regardless of whether the felony or theft actually committed is different from that originally contemplated, or whether any felony or theft actually is committed." (*In re Matthew A.*, at p. 540; *People v. Montoya*, at pp. 1041–1042.)

Because intent is rarely susceptible of direct proof, it may be inferred from the facts and circumstances disclosed by the evidence. (*People v. Holt*, *supra*, 15 Cal.4th at p. 669; *In re Matthew A.*, *supra*, 165 Cal.App.4th at p. 541; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) Evidence the defendant took property following the entry may create a reasonable inference that the intent to steal existed at the moment of entry. (*In re Matthew A.*,, at p. 541; *In re Leanna W.* (2004) 120 Cal.App.4th 735, 741.)

Pena argues that here, the evidence was insufficient to prove the intent element. He argues that Flores and Estrada were "rank amateurs" who failed to craft a competent plan to carry out the home invasion robbery, and in any event, he had no knowledge of their plan when he entered the duplex. He took property only because Estrada instructed him to do so, and did not remove anything from the residence.

Viewing the record in the light most favorable to the judgment, the evidence was sufficient to prove Pena intended to commit theft or robbery when he entered the duplex. Estrada and Flores were older, "known" gang members. Nieto described

them as "big homies," i.e., "somebody that's respected" in the neighborhood. Estrada was 41; Flores was 40. Nieto was 17; Pena was 19. Nieto did not have a lot of respect in the gang. It was expected that older gang members would "school" and discipline younger members. According to the People's gang expert, it was also expected that younger gang members would commit crimes for the gang and follow the lead of the older gang members.

In line with the foregoing norms, when Nieto and Pena encountered Estrada and Flores shortly before the home invasion robbery, Flores beat Nieto up for his perceived transgressions. Then, Estrada said that Hugo had his rifle. Flores claimed Hugo was "working with the cops" and was "a snitch," and accused Nieto of the same because he frequented Hugo's duplex. When Nieto denied this, Estrada said, "Let's go get the rifle then." Nieto took this to be a challenge. The clear implication was that Nieto was required to prove himself by assisting in retrieval of the rifle from Hugo by illicit means. It was not a reasonable inference that the men planned to pay a friendly social call on Hugo to pick up the rifle with permission. Had Estrada and Flores intended to obtain the rifle peaceably, with Hugo's consent, there would have been no need for Nieto to accompany them and prove himself.

Pena was present and would have heard the entire conversation. It was a reasonable inference that he understood the group was going to the duplex to steal the rifle or take it by force. Given that Pena chose to accompany Nieto and the others on their mission, it was also eminently reasonable for the jury to infer that Pena intended to assist in the goal of stealing the rifle or robbing Hugo of it. Pena, a younger gang member, could

14

hardly have expected to tag along without assisting his fellow gang members and helping to carry out the theft or robbery. That Pena knew the group's intent was to forcibly obtain the gun was also evidenced by his statement to Hugo, "they're going to ask you if you have guns here."

Furthermore, the circumstances of the gang members' entry into the duplex supported the conclusion that Pena had the requisite intent when he entered. It was approximately 2:00 a.m., not an hour when one might expect a cordial social call to transpire. Nor did the gang members behave like persons headed to an amicable visit. When they approached the duplex, they appeared mad, screamed and banged on the door, repeatedly demanded, "open the door," and threatened to break it down if they were not allowed in. Hugo discovered Pena and Nieto coming in through the back door, without permission. Based on this mode of entry, the jury could reasonably infer Pena knew the group was not there peaceably. Pena's comment as he approached the duplex, "Who cares, fool, we'll just blast him," also indicated he knew the group was there for an illicit and violent purpose.[10] This evidence strongly supports the inferences

---

[10] Pena attacks the evidence on this point as unreliable and contends it should have been excluded as irrelevant. Among other things, he argues that it was unclear how Maricarmen knew Pena was the person who made the statement. But Maricarmen testified she had seen Pena at the duplex previously and recognized him on the security camera when he and the others approached the door. When identifying him in a photographic lineup, she wrote, "as he was approaching my apartment I seen in the camera and heard his voice saying" "Who cares, fool, we'll just blast him." Accordingly, there was sufficient foundation for her testimony and the jury could reasonably

that Pena was well aware that the goal of the invasion was to steal the rifle or force Hugo to give it to the gang, and that he shared that intent. Indeed, it is difficult to imagine that a gang member, who joins a group of his fellow gang members, who force their way into an occupied residence at 2:00 a.m., has anything other than a felonious purpose in mind. And, it was not necessary that Pena was in on the scheme prior to encountering Flores and Estrada, as he appears to contend.

As to Pena's argument that he did not actually take property from the duplex, the record does not require this assumption. There was evidence he took Hugo's phone and wallet, and Hugo never got these items back. In any event, a failure to actually remove property from the duplex is immaterial. As noted, a defendant may be liable for burglary whether or not a theft or crime is actually committed inside the dwelling. (See, e.g., *People v. Montoya, supra,* 7 Cal.4th at pp. 1041–1042; *In re Matthew A., supra*, 165 Cal.App.4th at p. 540.) And, the fact that Pena was following a more senior gang member's directive does nothing to negate the intent element.

c. *The evidence was sufficient to prove robbery*

Pena next contends that the evidence was insufficient to prove he committed robbery, because there was an insufficient

_____

conclude it was accurate. Pena further argues that Maricarmen's testimony was not believable because no one in the group was armed with a gun; it was unclear the statement was directed at Hugo; Pena subsequently warned Hugo about the guns; and Pena left before the attack concluded. None of these points demonstrate the evidence lacked probative value. It was for the jury, not this court, to evaluate possible contradictions in the evidence. (See *People v. Penunuri, supra,* 5 Cal.5th at p. 142.)

16

showing he intended to permanently deprive Hugo of his property.

" 'Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Robbery requires the "specific intent to permanently deprive" the victim of his or her property.' " (*People v. Suarez* (2020) 10 Cal.5th 116, 168–169; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 489.)

Here, the evidence was sufficient to prove Pena took Hugo's personal property—his phone and wallet—from his immediate presence. Hugo testified that Nieto and Pena took him to one of the tenants' bedrooms, where Pena demanded, "Give me your phone and your wallet," and Hugo handed the items over. There was also evidence the taking was accomplished by force or fear. When asked why he complied with Pena's demand, Hugo explained, "I was afraid and I know these guys come in packs, you know, it's not going to be just two or three. I know there's a bunch of them . . . that's how they do it."

Pena does not challenge the sufficiency of the evidence for these elements, but argues there was insufficient proof he intended to permanently deprive Hugo of his property. He argues that he took the items only because Estrada or Flores directed him to; this directive was consistent with a desire to prevent the victims from calling police; and there is no evidence he kept the items when he left.

We are not persuaded. Our Supreme Court has noted that, in an appropriate case, a defendant's demand for a victim's wallet is alone sufficient to convict of attempted robbery. (*People v. Mora and Rangel, supra*, 5 Cal.5th at p. 489.) Here, of course,

17

there was more than an attempt: Hugo actually turned over his property.  The jury could reasonably infer that when a gang member participates in a home invasion in the middle of the night, and he and his fellow gang members demand cell phones and wallets from everyone present, it is unreasonable to believe they are simply collecting them for safekeeping and intend to return them at the conclusion of the evening.  Indeed, they did not do so here: when Flores was apprehended shortly after the crimes, he had three cell phones on his person, and Hugo never got his phone or wallet back.

And, the fact Hugo's phone and wallet were never recovered raises the inference that Pena did, in fact, remove them from the residence.  Whether Pena kept the items or discarded them is immaterial.  "Permanently," as used in the context of robbery, is " ' "not to be taken literally." ' " (*People v. Avery* (2002) 27 Cal.4th 49, 55; *People v. Davis* (1998) 19 Cal.4th 301, 307.) Where a defendant takes property with the intent to use it temporarily and then abandons it in circumstances making it unlikely the owner will recover it, the requisite intent for robbery exists.  (*People v. Avery*, at p. 56; *People v. Davis*, at p. 307, fn. 4; *People v. Hall* (1967) 253 Cal.App.2d 1051, 1054 ["The fact that the wallet was returned, or later discovered abandoned . . . does not absolve appellant of any element essential to support his conviction of robbery."].)  The evidence was sufficient.

d. *The evidence was sufficient to prove assault*

"An assault is 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (§ 240.)  An assault is aggravated when committed with a deadly weapon or 'by any means of force likely to produce great bodily injury.' (§ 245, subd. (a)(1).)  [¶]  'Assault requires the willful

commission of an act that by its nature will probably and directly result in injury to another (i.e., a battery), and with knowledge of the facts sufficient to establish that the act by its nature will probably and directly result in such injury.' " (*People v. Murray* (2008) 167 Cal.App.4th 1133, 1139; *People v. Malik* (2017) 16 Cal.App.5th 587, 598; see CALCRIM No. 875.)  Assault is a general intent crime; the intent to cause injury is not an element. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 486.)

It was undisputed that Pena did not join in the physical attack on Hugo.  Therefore, he can be liable for assault only as an aider and abettor.[11]  A person aids and abets a crime when he: (1) knows of the perpetrator's unlawful purpose; (2) intends to commit, facilitate, or encourage commission of the crime; and (3) by act or advice, aids, promotes, encourages or instigates its commission.  (*People v. Smith* (2014) 60 Cal.4th 603, 611; *People v. Delgado* (2013) 56 Cal.4th 480, 486.)  Mere presence at the crime scene is insufficient to establish aiding and abetting, but it is one factor, among others, that may support a conviction as an aider and abettor.  (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1065; *In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v.*

---

[11]    The People point out that an aider and abettor is guilty not only of an intended crime, but of any offense committed that is the natural and probable consequence of that crime.  (See *People v. Mejia* (2012) 211 Cal.App.4th 586, 606; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 530.)  Pena's jury was instructed on these principles in regard to the torture and kidnapping charges, but not in regard to the assault.  Despite this omission, the People argue that the jury could have found Pena guilty as an aider and abettor based on natural and probable consequences principles.  Given the instructional omission, we do not address this contention.

*Campbell* (1994) 25 Cal.App.4th 402, 409.) The act required for aiding and abetting liability need not be a substantial factor in the offense. " ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." [Citation.]' " (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell*, at p. 409; *In re Juan G.*, at p. 5.)

There was overwhelming evidence Pena's accomplices, Estrada and Flores, carried out an assault that was likely to—and did—cause great bodily injury to the victim; Pena does not argue otherwise. There was also sufficient evidence that Pena, by taking the victim's phone and by his mere presence during a large portion of the assault, facilitated the crime. The jury could readily infer that the fact a group of gang members were present with Estrada and Flores, and acted as "backup" for them, prevented Hugo from successfully fending off their attack or escaping sooner. The jury could also conclude Pena's and Nieto's presence discouraged or prevented the other persons present in the duplex from assisting Hugo. As the gang expert explained, the presence of multiple gang members causes fear and intimidation. In short, Pena's mere presence facilitated the brutal assault.

Pena argues the evidence was nonetheless insufficient, because he did not know that Estrada and Flores planned to assault Hugo, and therefore could not have intended to aid and abet in the offense. Again, we disagree. As we have explained, there was sufficient evidence Pena knew Flores and Estrada were

20

set on obtaining Hugo's rifle, and were bringing a group of gang members to obtain it.  The entry into the duplex was not peaceable.  The jury could reasonably infer Pena knew that, if Hugo failed to turn over the rifle, violence against him would ensue.  The gang expert testified that the State Street gang's primary activities included assault with deadly weapons and battery.  He also explained that in gang culture, violence is valued and bolsters a gang member's status and reputation. Given this evidence, it was hardly a stretch for the jury to conclude Pena must have been aware that an assault would transpire if Hugo was not cooperative.  Moreover, both the expert and Nieto testified about the consequences for persons believed to be "snitches."  According to the expert, a snitch was subject to violence from the gang, including an assault or even death. According to Nieto snitches could be beaten, stabbed, or killed. Pena had just heard Estrada claim that Hugo was a snitch.  It was to be expected, therefore, that the group would violently assault Hugo.

Estrada and Flores began beating Hugo almost immediately upon encountering him, when he stated he did not have the gun.  The beating continued for a substantial period of time.  According to Nieto, Pena left the scene, but not until Estrada retrieved the drill and began attacking Hugo with it. Thus, Pena was present for a significant portion of the assault, while Flores and Estrada punched, stomped, kicked, and burned Hugo.  At the very least, Pena had to have known of his accomplices' intent once the attack began; yet he stayed and provided backup for a significant period.  There was no evidentiary insufficiency.

21

2. *Jury instructions*

Pena next contends the trial court made instructional errors that violated state law and his federal constitutional rights to due process and a fair trial, requiring reversal.  We agree the court erred, but find the errors harmless.

a. *Failure to instruct with CALCRIM No. 203*

The parties did not request, and the trial court did not give, CALCRIM No. 203.  That instruction provides in pertinent part: "You must separately consider the evidence as it applies to each defendant.  You must decide each charge for each defendant separately."  The court has a sua sponte duty to instruct on this principle.  (*People v. Mask* (1986) 188 Cal.App.3d 450, 457.)  This is so because it is "fundamental that when more than one defendant is prosecuted in any action, the jury must consider separately the guilt or innocence of each defendant."  (*Ibid*.)  The People agree the instruction was improperly omitted, but aver that the omission was harmless.  We agree with the People.

The jury acquitted Pena of torture, kidnapping, attempted kidnapping, and assault with a deadly weapon.  It rendered different verdicts for Estrada and Flores on these counts, convicting them of torture, assault with a deadly weapon, and attempted kidnapping.  Thus, it is clear that the jury actually *did* consider the evidence individually and decided each charge for each defendant separately.  Accordingly, the omission was harmless under any standard.  (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Pena urges that the different verdicts are insignificant, because the torture, assault with a deadly weapon, and attempted kidnapping occurred after he had left the scene.  But this begs the question: the jury must have considered the

22

evidence in regard to each defendant individually, or it would have not taken into account the fact Pena left.  And, it is not accurate that the conduct amounting to torture occurred only after Pena departed the scene; he was present for the brutal beating and burning of Hugo's hand with the cigarette.  Reversal is not required.

> b. *Burglary instruction*
>> (i) *Additional facts*

The trial court initially read to the jury a modified version of CALCRIM No. 1700 (burglary), which was also contained in the original packet of instructions provided to the jury.  As the court was reading the instructions aloud, it alerted the jury that due to a computer glitch, some edits it had made to a different instruction, CALCRIM No. 1601, were not reflected in the written version.  The court stated that it would make the changes and provide the corrected instruction to the jury later that day.  The jury retired for deliberations at 10:07 a.m.

After the noon recess, the court informed the parties that it had made edits not only to CALCRIM No. 1601, but also to CALCRIM No. 1700 and a third instruction.  The jury was returned to the courtroom.  The court explained it had made corrections to the three instructions, read the corrected versions to the jury, and provided it with written copies of the newly edited instructions.  As pertinent here, the edited, written version of CALCRIM No. 1700 was as follows: "The defendants are charged in Count 2 with burglary in violation of Penal Code section 459.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1.  The defendants entered a building; [¶] AND  [¶] 2.  When they entered a building they intended to commit theft, assault or robbery[.]  [¶]  To decide

23

whether the defendant intended to commit theft, robbery or assault, please refer to the separate instructions that I have given you on those crimes. [¶] A burglary was committed if the defendant entered with the intent to commit theft or burglary. The defendants do not need to have actually committed theft as long as they entered with the intent to do so. The People do not have to prove that the defendant actually committed theft or burglary. The [P]eople allege that the defendants intended to commit theft, burglary or assault. You may not find the defendant guilty of burglary unless you all agree that they intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he intended." When reading the new instruction, the court once substituted "defendant" for "defendants"; thrice substituted "defendants" for "defendant"; and changed "he" to "they" in the last line.

Pena points to two problems with the instruction. First, he correctly observes that the instruction in some places used the plural "defendants," when it should have read "defendant." Second, the instruction inconsistently listed the target crimes, and in some places stated that the intent requirement was satisfied if the defendant (or defendants) had the intent to commit *burglary* when entering the dwelling. The People agree that the instruction contained errors, but contend they were harmless. We agree with the People.

(ii) *Applicable legal principles and standard of review*

In a criminal case, even absent a request, the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's

24

understanding of the case. (*People v. Molano* (2019) 7 Cal.5th 620, 667.) We review claims of instructional error de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We consider the challenged instruction in the context of the trial record and the instructions as a whole to determine whether there is a reasonable likelihood the jury applied it in an impermissible or unconstitutional manner. (*People v. Rivera*, at p. 326; *People v. Mitchell*, at p. 579.)

Pena argues that because the instruction "randomly alternated between" the singular "defendant" and the plural "defendants," the jury was likely confused about whether *all* defendants needed the required intent, or whether they were all guilty if only one of them had such an intent. We agree that the instruction was flawed, but in context, we do not believe the jury would have misapplied its language to Pena's detriment. We do not agree that the jury could have been confused in the way Pena suggests. Using their common sense, jurors likely understood that the instruction sometimes used the plural simply because there were three defendants, and did not attribute particular significance to the variance between the plural and the singular. " 'Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might' "; instead, a " 'commonsense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting.' " (*People v. Kumar* (2019) 39 Cal.App.5th 557, 568.)

Moreover, if jurors took the instruction's use of the plural "defendants" literally, this could only have inured to Pena's benefit. The language, "When they entered a building *they*

25

*intended* to commit theft, assault or robbery," read literally, could only mean that *all* the defendants must have had the requisite intent when they entered the duplex in order to find *any* of them guilty. The language cannot logically be read to mean that if only one defendant had the required intent, his intent could be attributed to the other defendants. Nothing in the instruction or the parties' arguments suggested that one defendant's intent would suffice to make the others guilty. Thus, there is no reasonable probability the jury misapplied the instruction; and even it if had, the error would have favored appellant.[12]

The instruction was also flawed in that it inconsistently listed the target crimes. The instruction began by correctly stating, under element 2, that the intent required at entry was to commit theft, assault, or robbery. This principle was immediately reiterated, again correctly, in the next sentence. But the instruction then deviated from those correct statements of law in the final paragraph, twice referring to the target crimes as "theft or burglary," once referring to "theft, burglary or assault," and once referring only to theft. As the People agree, a "person cannot commit burglary merely by intending to commit burglary."

---

[12] The same is true in regard to Pena's complaint that the aiding and abetting instruction, in some places, also used the plural "defendants." Moreover, the aiding and abetting instruction expressly clarified that the aider and abettor had to personally know and intend the crime; it stated, "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

Nonetheless, " '[n]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906.) Here, despite the instructional fumble, we cannot see how a reasonable jury, exercising its common sense, would have been misled to Pena's detriment. Instead, reasonable jurors would have understood that the second paragraph simply contained typographical errors, and relied on the correct portion of the instruction that listed the elements.

An examination of the particulars of the second paragraph makes this clear. The first sentence of the second paragraph stated, "A burglary was committed if the defendant entered with the intent to commit theft or burglary." To the extent the language referenced theft, it was correct; it was incomplete in that it failed to list assault and robbery, but elimination of two of the target crimes was helpful, not harmful, to Pena. To the extent it stated that "a burglary was committed if the defendant entered with the intent to commit . . . burglary," this language directly contradicted the first half of the instruction, and was nonsensical to boot. Jurors would either have reasoned that the instruction contained a typographical error, or would have assumed the reference to burglary was shorthand for the two elements listed earlier in the instruction, and looked to that earlier portion for guidance. The same is true in regard to the last two sentences of the instruction. Most likely, the jury simply relied on the correct statement of the elements listed twice at the beginning of the instruction.

This understanding was reinforced by the prosecutor's argument, in which he expressly stated, "These are the only two elements that I have to prove beyond a reasonable doubt for these

defendants to be guilt of burglary, CALCRIM 1700. The defendant entered a building and when he entered the building he intended to commit theft, robbery, assault or a felony, right." (See *People v. Young* (2005) 34 Cal.4th 1149, 1202 ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."]; *People v. Harper* (2020) 44 Cal.App.5th 172, 193.) Pena argues that the prosecutor's argument was irrelevant since the jury was instructed that it should be guided by the instructions, not the arguments. But the first portion of the instruction was consistent with the prosecutor's argument, bolstering the conclusion that the jury would have understood which elements were required.

The next line in the instruction, "The defendants do not need to have actually committed theft as long as they entered with the intent to do so," reinforced that the intent to commit a crime other than "burglary" was required; omission of the other target crimes, again, could not have prejudiced Pena. The next line, "The People do not have to prove that the defendant actually committed theft or burglary," was correct to the extent it referenced theft and nonsensical to the extent it referenced burglary. No reasonable juror would have concluded the People did not have to prove Pena committed the charged crime of burglary. To adopt such an understanding, jurors would have had to completely disregard not only the clear statement of the elements set forth at the beginning of the instruction and during the prosecutor's argument, but also the fundamental instructions given regarding reasonable doubt and the People's burden of proof. We presume jurors are intelligent persons, capable of understanding and correlating all the instructions they are given.

28

(*People v. Landry* (2016) 2 Cal.5th 52, 95; *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 915.)

We are not persuaded by Pena's argument that, based on the instructional errors, the jury could have found him guilty even if it concluded he did not intend to commit any crime when he entered the duplex. And, as we have discussed *ante*, there was strong evidence he intended to assist his fellow gang members in committing a theft or robbery inside the duplex. The instruction was partially correct and advised the jury of the elements of the crime. We cannot conceive of a way that the jury realistically could have interpreted the errors in the second paragraph in a fashion that prejudiced Pena, especially in light of the strong evidence of his intent.

Although we conclude the instructional errors were harmless, we find them troubling. It is unfortunate that neither the trial court, the prosecutor, nor the three defense attorneys noticed these errors and rectified them at trial.

3. *Sentencing issues*

The trial court sentenced Pena as follows. For the first degree residential burglary, it imposed the midterm of four years, stayed pursuant to section 654. For the home invasion robbery and the attached gang enhancement, it imposed life in prison with a minimum 15-year parole eligibility date. (See § 186.22, subd. (b)(4)(B).) On the conviction for assault by means likely to produce great bodily injury, it imposed the high term of four years, consecutive, plus the high term of four years on the related gang enhancement.[13] The court explained that it found, as

---

[13]     During trial, Pena pled no contest to unlawfully taking or driving a vehicle in violation of Vehicle Code section 10851, subdivision (a) and hit and run driving in violation of Vehicle

factors in aggravation, that the victim was vulnerable; the manner in which the crime was committed indicated planning; Pena had served a prior prison term; and his prior convictions were numerous and increasing in seriousness.[14]

          a. *Section 654 does not bar sentence on the assault conviction*

Pena argues that the trial court should have stayed sentence on the assault conviction, because there was insufficient evidence he harbored separate intents and objectives in the assault and the robbery.

Section 654 "generally precludes multiple punishments for a single physical act that violates different provisions of law [citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute [citations]." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111–112, italics omitted.) Whether a course of criminal conduct is divisible depends on the intent and objective of the actor. If all the offenses were incidental to one objective, the defendant may be punished for any one them, but not for more than one. (*People*

---

Code section 20002, subdivision (a), both arising from an unrelated incident occurring on June 19, 2014. For those offenses the court imposed the low terms of 16 months and 6 months, respectively, to be served concurrently with the terms on the burglary and assault charges. Pena does not challenge these convictions or sentences on appeal.

[14]    The reporter's transcript reads, "The defendant's prior conviction [*sic*] were numerous and precedes seriousness." In context, it is clear that the word "precedes" is either a typographical error or a misstatement, and the court intended to say the offenses were increasing in seriousness.

*v. Jackson* (2016) 1 Cal.5th 269, 354.)  But if the defendant harbored multiple objectives, independent of and not merely incidental to each other, he may be punished for each violation committed in pursuit of each independent objective, even though the violations share common acts or were parts of an otherwise indivisible course of conduct.  (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1112; *People v. Vasquez* (2020) 44 Cal.App.5th 732, 736–737.)  The temporal proximity of the two offenses is insufficient by itself to establish they all were incidental to a single objective.  (*People v. Jackson*, at p. 354; *People v. Vasquez*, at p. 737.)

Whether section 654 applies is a question of fact for the trial court, which has broad latitude in making its determination. Its findings will be upheld if supported by substantial evidence, and we view its determination in the light most favorable to the judgment.  (*People v. Jackson*, *supra*, 1 Cal.5th at p. 354; *People v. DeVaughn*, *supra*, 227 Cal.App.4th at p. 1113; *People v. Vasquez*, *supra*, 44 Cal.App.5th at p. 737.)  When the trial court does not explicitly consider section 654, we infer that it implicitly determined each crime had a separate objective.  (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94; *People v. Tarris* (2009) 180 Cal.App.4th 612, 626–627.)  Because a sentence imposed in violation of section 654 is unauthorized, it may be corrected at any time even if the defendant did not object below. (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13; *People v. Brents* (2012) 53 Cal.4th 599, 618.)

"It has long been recognized that where a defendant is convicted of robbery and other crimes incidental to the robbery such as assault, section 654 precludes punishment for both crimes."  (*People v. Mitchell* (2016) 4 Cal.App.5th 349, 354.)  But

31

there is an exception to this principle. "[A]n act of 'gratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as not "incidental" to robbery for purposes of Penal Code section 654.' [Citations.]" (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1016; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271–272.) " '[A]t some point the means to achieve an objective may become so extreme they can no longer be termed "incidental" and must be considered to express a different and more sinister goal than mere successful commission of the original crime. . . .' " (*People v. Cleveland*, at p. 272; *People v. Vasquez, supra*, 44 Cal.App.5th at p. 737 [§ 654 " 'cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense' "].)

Section 654 is inapplicable here because the robbery and the assault involved different acts and gratuitous violence. In the former, Pena took Hugo's phone; in the latter, Pena's accomplices brutally beat Hugo. (See *People v. Jackson, supra*, 1 Cal.5th at p. 354 [§ 654 inapplicable where two crimes were accomplished by different physical actions].) Pena had already robbed Hugo when he aided and abetted his accomplices' gratuitous attack. Flores's and Estrada's conduct of repeatedly punching, kicking, stomping, and burning the unresisting Hugo was far more extreme than that necessary to commit a simple robbery, and cannot be considered merely incidental. Accordingly, section 654 did not operate to bar sentence on both robbery and assault.

*People v. Galvez* (2011) 195 Cal.App.4th 1253, is instructive. There, the assailants tried to take a victim's phone to prevent him from reporting a crime. After he dropped the phone the assailants nonetheless stomped and kicked him.

(*Id.* at pp. 1257–1258.)  Section 654 did not preclude punishment for both assault and attempting to dissuade a witness; it was "reasonable to infer that appellant's primary objective in assaulting [the victim] while he was on the ground was to enhance the gang's reputation for violence, not to dissuade or prevent him from using his cell phone to call the police.  These distinct acts of violence were not incidental to the attempted witness dissuasion.  They were gratuitous, extra, and may be separately punished without offending section 654." (*Galvez*, at p. 1263; see also *People v. Cleveland*, *supra*, 87 Cal.App.4th at pp. 271–272 [section 654 inapplicable when defendant repeatedly hit a feeble, unresisting victim on the head with a two-by-four board, using more force than necessary to achieve robbery]; *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299–1300.)

Pena argues that because the trial court stayed Estrada's and Flores's sentences for burglary and assault, his sentence should also be stayed.  This argument is unavailing.  Pena's burglary sentence was stayed.  Unlike Pena, Flores and Estrada were convicted and sentenced on the torture count.  Thus, as to them, the court presumably concluded the assault and the torture were carried out pursuant to a single objective.  The court did not stay the robbery charge for any of the defendants.  Even if relevant, the sentences imposed on Pena's codefendants do not support his argument.

b. *Imposition of the upper term*

Pena next contends the trial court abused its discretion by imposing the upper term on the assault count and the attached gang enhancement.  He argues that two of the four factors the court relied upon—that the victim was vulnerable, and that the

crime involved planning—were not supported by substantial evidence.

Section 1170, subdivision (b) provides that when a statute provides for three possible terms, the choice of the appropriate term rests within the trial court's discretion. "Sentencing courts have wide discretion in weighing aggravating and mitigating factors." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258; see Cal. Rules of Court, rule 4.420(b).) A court may base an upper term sentence upon any aggravating circumstance that it deems significant, as long as it is reasonably related to the sentencing decision. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1063–1064.) A single aggravating factor will support an upper term sentence. (*People v. Osband* (1996) 13 Cal.4th 622, 728; *People v. Weber*, at p. 1064; *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1182.)

We review a trial court's sentencing choices for abuse of discretion and reverse only when there is a clear showing the sentence is arbitrary or irrational. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Ogg* (2013) 219 Cal.App.4th 173, 185.) A court abuses its discretion if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. (*People v. Sandoval*, at p. 847; *People v. Weber*, *supra*, 217 Cal.App.4th at pp. 1063–1064.) The burden is on the party attacking the sentence to clearly show the trial court's decision was irrational or arbitrary. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116; *People v. Lai*, *supra*, 138 Cal.App.4th at p. 1258.)

Pena did not object below that the circumstances he now challenges were unsupported by the evidence, and his contentions have been forfeited. " 'A party in a criminal case may not, on

34

appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial.  [Citation.]  The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." ' " (*People v. Scott* (2015) 61 Cal.4th 363, 406; *People v. Scott* (1994) 9 Cal.4th 331, 353; *People v. Kidane* (2021) 60 Cal.App.5th 817, 826; *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1100–1101.)

Anticipating this hurdle, Pena contends that if the issue was not preserved, his trial counsel provided ineffective assistance by failing to interpose the appropriate objections.  To establish ineffective assistance, a defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance resulted in prejudice, that is, there is a reasonable probability that, but for counsel's errors, defendant would have achieved a more favorable result.  (*People v. Bell* (2019) 7 Cal.5th 70, 125.)

Pena has not met these requirements here.  First, we are not convinced that the two challenged factors were unsupported by the evidence.  A victim is particularly vulnerable when he or she is vulnerable in a special or unusual degree, to an extent greater than in other cases, and is " 'defenseless, unguarded, unprotected, accessible, assailable . . . susceptible to the defendant's criminal act.' " (*People v. Clark* (1990) 50 Cal.3d 583, 638; *People v. Smith* (1979) 94 Cal.App.3d 433, 436.)  Such was the case here.  Hugo was attacked in his home, at 2:00 a.m., a

time and place in which one's guard is normally down. Due to the late hour, he was particularly susceptible to the crimes: the assailants could force their way into the duplex without attracting the attention of neighbors or pedestrians who might have called for help. Hugo's home was invaded by a group of gang members, including Pena, who outnumbered him and prevented the other persons in the duplex from coming to his assistance and stopped him from escaping until after he had been beaten and tortured. These facts were sufficient to demonstrate vulnerability.

Pena's arguments to the contrary are not persuasive. The fact Hugo's previous interactions with Nieto and Pena were friendly arguably served to make him more, rather than less, vulnerable, in that their presence may have initially made him unlikely to anticipate the brutal assault that followed. That Hugo happened to be awake, and was able to exercise heroic efforts to push the drill away from his eyes, does not demonstrate a lack of vulnerability. He was not able to successfully defend against the attack: the gang's assault necessitated his two-day hospital stay, and resulted in lingering effects still present at the time of trial, over two years later. The fact he escaped, rather than being further harmed or forced into the trunk of the waiting car, was merely fortuitous.

We are also not convinced by Pena's argument that the crime "reeked of a lack of planning." Estrada demanded guns and money from Hugo prior to the attack; when his demand went unfulfilled, he and Flores planned an attack for the middle of the night; recruited other gang members to assist; removed the surveillance camera before leaving; and had a car and a large

knife waiting behind the duplex to complete their nefarious purposes.  These facts were sufficient to show planning.

Moreover, even if, as Pena argues, the "planning" factor cannot be attributed to him because he was pressed into service at the last minute, he has failed to show a more favorable result was likely even had his counsel objected.  In addition to the planning and vulnerability factors, the court also based its imposition of the upper term on the facts Pena had served a prior prison term, and his prior convictions were numerous and increasing in seriousness.  Pena does not challenge the sufficiency of the evidence to support these findings, and his probation report indicates their accuracy.  Additionally, the probation report indicates his prior performance on probation was unsatisfactory.  Thus, even apart from the challenged circumstances, there were enough aggravating factors to support the trial court's sentencing choices.  (See Cal. Rules of Court, rule 4.421(b).)  An objection from defense counsel would therefore have been futile.  "Failure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                    EDMON, P. J.


We concur:



        LAVIN, J.



        KALRA, J.*


---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.